**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| AZURITY PHARMACEUTICALS, INC. | ) | |
| | ) | Civil Action No. ____________________ |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| KIMBERLY DEACON | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**VERIFIED COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF**

Plaintiff Azurity Pharmaceuticals, Inc. ("Azurity") brings this action for preliminary and permanent injunctive relief and monetary damages against Defendant Kim Deacon, and alleges as follows:

## I. PRELIMINARY STATEMENT

1. Defendant is a former employee of Azurity. She, in addition to two of her colleagues, left Azurity with the intent to join one of Azurity's competitors, Shorla Oncology, Inc. ("Shorla"). Both Azurity and Shorla develop and market pharmaceuticals. In particular, Shorla markets a product called Jylamvo, which directly competes with Azurity's product Xatmep, as both are pediatric oral liquid methotrexate products for acute lymphoblastic leukemia and polyarticular juvenile idiopathic arthritis.

2.

3. Prior to her departure from Azurity, Defendant improperly maintained Azurity's confidential information and trade secret information by circulating various materials to her personal email address.

4. Azurity asks the Court to enjoin Defendant from sharing or using Azurity's Trade

Secrets and to order other relief to prevent Defendant from benefiting from her unlawful actions and to compensate Azurity for all harm inflicted by Defendant.

5. Azurity brings this action to protect its confidential information and trade secrets and to prevent Defendant from using such information to her own advantage.

## II. THE PARTIES

6. Azurity Pharmaceuticals, Inc., is a Delaware corporation whose high-level officers direct, control, and coordinate the corporation's activities from its U.S. headquarters in Woburn, Massachusetts.

7. Defendant Deacon is an adult individual with a last known principal residence at 1714 Holmes Drive, Sewickley, Pennsylvania.

8. Simultaneous with this Complaint, Azurity is separately initiating two additional actions against Defendant's co-conspirators: (1) an action in the Middle District of Florida against Sheila Bhattacharya ("Bhattacharya"), and (2) an action in the Eastern District of Pennsylvania against Michael Gitmore ("Gitmore").

## III. JURISDICTION AND VENUE

9. This Court has jurisdiction over this case pursuant to 28 U.S.C. § 1331 because Azurity asserts claims under the federal Defend Trade Secrets Act, 18 U.S.C. §1836.

10. This Court also has jurisdiction pursuant to 28 U.S.C. § 1332 by virtue of the parties' diversity of citizenship and because the amount in controversy exceeds Seventy-Five Thousand Dollars ($75,000), exclusive of interest and costs.

11. This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. §1367 because they are related to the federal claims in that they form part of the same case or controversy.

12. The Court has personal jurisdiction over Defendant because she resides in this district.

13. Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Azurity's claims occurred in this District, and Gitomer is subject to this Court's personal jurisdiction with respect to this action.

## IV. FACTUAL ALLEGATIONS

### A. Nature of Azurity's Business and Competitive Environment

14. Azurity Pharmaceuticals, Inc. ("Azurity") is a privately held specialty pharmaceutical company headquartered in Woburn, Massachusetts.

15. Azurity develops and commercializes innovative pharmaceutical products. It focuses on delivering high-quality medicines to underserved patient populations, particularly children and the elderly.

16. Azurity specializes in dose-form innovations of established medicines for patients who have unmet needs.

17. Azurity maintains a diversified portfolio of more than 50 medicines. Its products span ten dosage forms and ten key therapeutic areas, including cardiovascular, central nervous system, endocrine, gastrointestinal, anti-infective, and oncology medicines.

18. The specialty pharmaceutical market in which Azurity operates is intensely competitive and rapidly evolving. The global specialty pharmaceutical market was valued at approximately $679 billion in 2024, with forecasts projecting growth to nearly $1.6 trillion by 2033.

19. The U.S. pharmaceutical market overall was valued at approximately $632 billion in 2024. It is projected to exceed $1 trillion by 2033. Market participants compete aggressively on

the basis of product innovation, pricing, regulatory approvals, and customer relationships.

20. Azurity's products are marketed and sold in more than 50 countries worldwide, including the United States.

21. Within the United States, Azurity's sales representatives and business development personnel conduct outreach to physicians, healthcare providers, and pharmacies.

22. Azurity's primary customers include hospitals, healthcare providers, specialty pharmacies, and pharmaceutical distributors.

23. Azurity generates revenue through the sale of specialty pharmaceuticals to healthcare providers and distributors. Its transactions are typically structured as business-to-business agreements, with healthcare facilities purchasing medications to treat their patients.

24. Azurity also engages in exclusive distribution partnerships to extend its market reach.

25. Due to the highly competitive nature of the specialty pharmaceutical industry, the loss of proprietary business information - including customer relationships, pricing data, and product pipeline intelligence - can cause immediate and irreparable competitive harm.

### B. Defendant's Employment and Restrictive Covenants with Azurity

#### i. Defendant's Employment

26. Until June 19, 2026, Azurity employed Defendant as Strategic Accounts Manager, where she acted as the primary liaison for high-value accounts, including Payers, Medicaid and GPOs, ensuring seamless communication. Defendant was experienced in oral and infused oncology medications.

27. Both Bhattacharya and Gitomer were also members of Azurity's Strategic Accounts Team.

28. In connection with her initial employment with Arbor Pharmaceuticals, a predecessor in interest to Azurity, Defendant agreed to be bound to a Proprietary Information, Inventions and Non-Solicitation Agreement, which is attached hereto as **Exhibit A**.

29. In paragraph 12.4 of the 2011 this Agreement, Defendant agreed that the Agreement "will be for the benefit of the Company, its successors and assigns" and she "expressly agree[d] that the Company's successors and assigns may enforce this Agreement."

30. In 2019, Defendant again promised to keep her employer's trade secrets confidential when she executed another copy of the Proprietary Information, Inventions and Non-Solicitation Agreement, which is attached hereto as **Exhibit B.**

31. Similarly, in paragraph 12.4 of the 2019 Agreement, Defendant agreed that the Agreement "will be for the benefit of the Company, its successors and assigns" and she "expressly agree[d] that the Company's successors and assigns may enforce this Agreement."

32. When Arbor Pharmaceuticals merged with Azurity on or about September 20, 2021, Azurity became Defendant's employer, and became the successor to the Agreement.

33. Both the 2011 and the 2019 Agreements informed Defendant of her obligation to maintain the confidentiality of Azurity's proprietary business information throughout her employment and after the end of her employment for so long as the information remained confidential, and to return all information at the end of her employment.

34. Both the 2011 and 2019 Agreements contain the following provisions:

**a. Nondisclosure Obligation:**

> I recognize that all Proprietary Information (as defined below) is and shall remain the sole and exclusive property of the Company. At all times during my employment and thereafter, I will hold in strictest confidence and will not disclose or use any Proprietary Information, except as such disclosure or use may be required in connection with my work for the Company or unless the Company expressly authorizes such disclosure or use in writing. I will obtain

the Company's written approval before publishing or submitting for publication any material (written, verbal, or otherwise) that relates to my work at the Company and/or incorporates any Proprietary Information. I hereby assign to the Company any rights I may have or acquire in such Proprietary Information. I will take all reasonable precautions to prevent the inadvertent or accidental disclosure of Proprietary Information. If I am ever requested or required by subpoena, court order, or similar process to disclose any Proprietary Information, I agree that I will provide the Company with immediate notice of such request(s) for subpoena, court order, or similar process so that the Company may take appropriate action.

**b. Proprietary Information Acknowledgment:**

The term 'Proprietary Information' means all confidential and/or proprietary knowledge, data or information of the Company. By way of illustration but not limitation, 'Proprietary Information' includes all or any of the following: (a) trade secrets, inventions, ideas, processes, formulas, source and object codes, data, programs, other works of authorship, know-how, improvements, discoveries, developments, designs, techniques, Assigned Inventions (as defined below), Company Inventions (as defined below) and any other proprietary technology and all trade secrets, patents, copyrights, trademarks and other intellectual property rights throughout the world in those Assigned Inventions and Company Inventions, (b) information regarding plans for research, development, new products, marketing and selling, business plans, budgets and unpublished financial statements, licenses, prices and costs, margins, discounts, credit terms, pricing and billing policies, quoting procedures, methods of obtaining business, forecasts, future plans and potential strategies, financial projections and business strategies, operational plans, financing and capital raising plans, activities and agreements, internal services and operational manuals, methods of conducting Company business, suppliers and supplier information and purchasing; (c) information regarding customers and potential customers of the Company, including customer lists, names, representatives, customers' needs or desires with respect to the products or services offered, proposals, bids, contracts and their contents and parties, the type and quantity of products and services provided or sought to be provided to customers and potential customers of the Company and other non-public information relating to customers and potential customers; (d) information regarding any of the Company's business partners and their services, including names, representatives, proposals, bids, contracts and their contents and parties, the type and quantity of products and services received by the Company, and other non-public information relating to business partners; (e) information regarding personnel, employee lists, compensation, and employee skills; and (f) any other non-public information that a competitor of the Company could use to the competitive disadvantage of the Company. Notwithstanding the foregoing, it is understood that, at all times, I am free to use information that is

generally known in the trade or industry through no breach of this Agreement or other act or omission by me.

c. **Obligation to Return/Destroy Proprietary Information:**

At any time upon request of the Company and when I leave the employ of the Company, I will deliver to the Company, or, if delivery is impossible, certify to the destruction of, any and all drawings, notes, memoranda, specifications, devices, formulas, and documents, together with all copies thereof, and any other material containing or disclosing any Company Inventions, Third Party Information or Proprietary Information in whatever form such information is contained.

35. Additionally, Defendant was subject to Azurity's: (1) Code of Conduct; (2) Access Control Policy; and (3) Acceptable Use Policy.

**ii. Defendant's Access to Confidential Information and Trade Secrets**

36. Azurity required its employees, including Defendant, to participate in training regarding the importance of maintaining the confidentiality of its proprietary business information and trade secrets, both during their employment and afterward for as long as the information remains confidential.

37. Defendant was instructed on her responsibility to protect the confidentiality of Azurity's proprietary business information, including:

a. All customer lists, customer contacts, and the terms and expiration dates of every customer service agreement - past and present.

b. All proposals for services to prospective customers.

c. Azurity's budgeting and forecasting methods and data.

d. All sales figures, profit and loss data, profit margins, costs, overhead, and other financial, accounting, and bookkeeping information.

e. All information about Azurity's operations, business development, acquisition strategy, business strategy, and marketing plans.

f. The names, identities, and contact information for Azurity's vendors and suppliers - along with every term of every contract with those vendors and suppliers.

g. Management evaluations of Azurity's resources and assets, including technology, real estate, and employee performance.

h. All third-party information provided to Azurity in confidence, and all information developed using that third-party information.

38. Defendant was informed that she may not use or disclose any Confidential Information in any way that is not expressly authorized by Azurity and undertaken for its benefit, including by not copying, recreating, using, or disclosing Confidential Information for the benefit of any competitor or anyone preparing to compete with Azurity.

39. Additionally, Defendant was directed to return all records containing Confidential Information at the end of their employment with Azurity.

40. Azurity's Code of Conduct includes a provision stating that:

> All company-related or company-owned data and information - including those on our personal devices - are considered proprietary information and are the property of Azurity. These data and information are subject to inspection, review and/or collection by Azurity.

41. Azurity's Access Control Policy is specifically designed to "provide appropriate security requirements in ensuring the critical business data classified as Secret or Confidential information remains secure" and prohibits non-compliance.

42. Azurity's Acceptable Use Policy prohibits the use of personal email accounts for sharing confidential information, backup of Azurity information on unauthorized devices, and requires that all Azurity devices/account access be returned or ceased on an employee's last day of employment.

43. Subject to these various policies, Azurity employees were extensively made aware of and reminded of their confidentiality obligations.

**iii. Azurity Took Reasonable Steps to Protect Its Confidential, Proprietary and Trade Secret Information**

44. Azurity would not have employed or continued to employ Defendant without the assurances that she would retain the confidentiality of Azurity's information.

45. As a senior member of the Strategic Accounts team, Defendant had access to a great deal of highly confidential information and trade secrets, information which Azurity vigorously protects from competitors.

46. The confidential and proprietary information and trade secrets, all of which the Company authorized Defendant, to access while serving as Azurity's employee, are highly sensitive, commercially valuable, and would be extremely useful to competitors in their efforts to compete with Azurity for business and market share.

47. Azurity invests substantial time, money, and other resources both to develop this confidential and proprietary information and takes (and has always taken) reasonable measures to protect it from dissemination to competitors and others outside of the company. These measures include, but are not limited to:

a. encrypting data on company-owned devices with access to company data;

b. password protecting all company-owned devices with access to company data;

c. taking reasonable measures to limit the disclosure and distribution of such information to individuals who need access to such information to perform their job responsibilities; and

d. requiring all employees to affirm, as part of their employment offer, that they will maintain the confidentiality of Azurity's confidential and proprietary information and trade secrets.

48. Accordingly, the above-referenced confidential and proprietary information and trade secrets are not generally known to the public.

49. With access to highly sensitive, confidential, and proprietary information and trade secrets, Defendant has the knowledge necessary to engineer a strategy that would allow a competitor to unfairly and unlawfully compete with Azurity.

**iv. Azurity's Legitimate Business Interests**

50. Azurity possesses substantial and legally protectable business interests, including trade secrets, confidential business information, customer relationships, and goodwill. These interests are recognized and protected, including under Pennsylvania law. 12 Pa. Cons Stat § 5302 (2025).

51. Azurity's confidential information and trade secrets include, but are not limited to: customer lists and customer contacts; the terms and expiration dates of customer service agreements; proposals for services to prospective customers; budgeting and forecasting methods and data; sales figures, profit and loss data, profit margins, costs, and overhead; information about Azurity's operations, business development, acquisition strategy, and marketing plans; vendor and supplier identities and contract terms; management evaluations of company resources and assets; and third-party information provided to Azurity in confidence.

52. Azurity developed this confidential information over many years and at substantial expense. It maintains this information in confidence and does not make it available to the public or to competitors.

53. Azurity's customer relationships are the product of significant investment of time, resources, and effort by its sales and business development teams. These relationships give Azurity a competitive advantage that would be lost if disclosed to or exploited by a competitor.

54. Azurity prohibits its employees from using or disclosing Azurity's confidential information in any manner not expressly authorized by Azurity. Employees are further required to return all records containing confidential information upon the termination of their employment.

55. More particularly, Azurity's strategic accounts employees are entrusted with access to highly sensitive and competitively valuable information in the ordinary course of their work.

56. Strategic accounts personnel at Azurity have access to account-specific and product-specific pricing strategies and models. This information is not publicly available and is closely guarded as a trade secret.

57. These employees also have access to customer lists, including the identities of and contact information for key decision-makers at hospitals, specialty pharmacies, and healthcare systems.

58. Azurity's strategic accounts employees have access to detailed business review insights, product utilization data, contract-performance data, and rebate and chargeback data.

59. These employees gain detailed knowledge of Azurity's product pipeline, including strategies regarding the planned product and pricing strategies.

60. Such personnel develop close personal relationships with Azurity's customers. These relationships are built through years of repeated contact, trust, and service. They represent substantial goodwill belonging to Azurity.

61. The information described above—including pricing models, cost structures, pricing strategies, product pipeline, sales data, rebate or chargeback data, and similar knowledge—

constitutes protectable business interests under 12 Pa. Cons. Stat. §5302.

62. If a competitor were to obtain this information through a former employee, it could use it to undercut Azurity's pricing, target Azurity's existing customers, and gain an unfair competitive advantage. This would cause immediate and irreparable harm to Azurity's business.

**C. Defendant's Misconduct**

63. Bhattacharya separated from Azurity on or about September 2, 2025.

64. Gitomer separated from Azurity on or about June 5, 2026.

65. Defendant separated from Azurity on June 19, 2026.

66. Unbeknownst to Azurity, and prior to their respective departures, Bhattacharya, Gitomer and Defendant each retained confidential and proprietary information and trade secrets.

67. Prior to her departure, Bhattacharya e-mailed to her personal e-mail address, documents that contained Azurity's confidential and proprietary information and trade secrets:

a. This included a PowerPoint presentation involving commercial due diligence marked "Private and Confidential" that Azurity commissioned regarding a code-named project on a specified pharmaceutical that included sensitive prescriber insights, payer insights, pharmaceutical treatment parameters, prescriber research, payer research (that included different pricing and insurance coverage options research), research regarding product utilization rates, amongst other sensitive information.

b. Bhattacharya also e-mailed a copy of an Oncology Monthly Franchise Alignment Review Meeting PowerPoint Presentation, that addressed business strategy and strategic plan with product budget, net revenues, actual versus projected unit sales, performance by region, top health care provider to target

for each region, and related information regarding one of Azurity's pharmaceutical products.

68. In or about June 2026, Bhattacharya became the Chief Commercial Officer for one of Azurity's competitors, Shorla.

69. Azurity and Shorla directly compete with at least one pharmaceutical product, with Shorla producing a pharmaceutical, Jylamvo, which directly competes with Azurity's product, Xatmep, as both are pharmaceuticals within the liquid pediatric oncology medication market.

70. Defendant and Gitomer have recently begun working for Shorla as Strategic Account Managers/Directors, alongside Bhattacharya.

71. Prior to leaving Azurity and unbeknownst to Azurity at the time, Defendant and Gitomer both forwarded to their personal e-mail addresses confidential and proprietary information and trade secrets owned by Azurity.

72. Prior to leaving his employment with Azurity, Gitomer misappropriated Azurity's trade secrets, proprietary business and/or confidential information by forwarding information from Azurity's systems to his personal email address.

73. Gitomer sent himself documents containing Azurity's confidential and proprietary information via emails from his Azurity email account to his personal email account on over dozen dates during his last month of employment (between May 5 and June 5).

74. Defendant sent herself documents containing Azurity's confidential and proprietary information via emails from Defendant's Azurity email account to Defendant's personal email account on numerous occasions during his last several weeks of employment (between June 7and June 22).

75. The documents containing confidential and proprietary information which

Defendant emailed to herself include, among other things, strategic market-access and account-planning materials identifying priorities, portfolio-access objectives, GPO/IDN account goals, headwinds and tailwinds, formulary and contracting strategies, net-revenue priorities, gross-to-net considerations, launch plans for Azurity pharmaceutical products, account lists, and business-development records reflecting contract status, pricing and rebate issues, formulary-transition efforts, 340B considerations, customer contacts, follow-up instructions, strategic notes for health systems, GPOs, specialty pharmacies, correctional pharmacy accounts, and other key customers.

76. Of particular note, the materials Defendant sent herself include materials that reference Azurity's Xatmep, the competitor product for Shorla's Jylamvo, among other confidential and trade secret information of Azurity:

a. On Sunday June 7, 2026, Defendant sent from her Azurity email to her personal email *Chapter_BW_Meeting_Agenda_Expanded.docx*, which is a template form used by Azurity representatives for setting up meeting agendas and taking relevant notes.
b. On Monday June 8, 2026, Defendant forwarded to her personal email an email chain from July 2024 which contained *Certificants_by_Specialty_and_Locations.xls*, which is an excel sheet listing the name, location, credentials, and status of pharmacologists across the country. This trade secret concerns customer lists, customer contacts, and business development property of Azurity.
c. On Monday June 8, 2026, Defendant sent to her personal email *Society of Health Systems.xlsx*, which is an excel sheet listing meetings that Azurity team members would be attending, the cost of attendance, and further notes about the attendees.
d. On Tuesday June 9, 2026, Defendant sent to her personal email *M360_State_Contact_List (6).xlsx*, which is an excel sheet detailing Medicaid agencies, contact information for their representatives, and notes about relationships with the customers.
e. On Friday June 12, 2026, Defendant forwarded to her personal email an email chain from April 2026 which contained *MSHP REVERSE EXPO.docx*, which contains notes taken by Azurity Institutional Manager John Fisher from a conference. The notes detail institution customers, their contact information, and further notes regarding their interactions with Azurity representatives.
a. On Friday June 12, 2026, Defendant forwarded to her personal email *Fall 2026 IDN Summit Registration and Hotel Template.xlsx*, which is an excel sheet that listed Defendant Deacon, Michael Gitomer, and Hank Morris'

contact details and further information about their attendance to a conference. The email also contains one of Azurity's company credit card numbers.

f. On Thursday June 18, 2026, Defendant sent to her personal email *dob (1).csv*, which is a download document listing all of her LinkedIn connections.

g. On Friday June 19, 2026, Defendant sent from her Azurity email to her personal email *Deacon accounts.xlsx*, which is an excel sheet listing all of Defendant's clients, the type of contract they had, the status of that client's business, their contact information, a designation of how high priority that client's business is to Azurity, and further business notes about their purchasing information. This information was compiled for Azurity's business purposes and includes business details that would not be shared externally.

h. On Friday June 19, 2026, Defendant sent from her Azurity email to her personal email *Deacon Market Access GPO.IDN Business Plan Template.pptx*, which is a PowerPoint presentation created by Azurity for internal purposes of presenting the company's different brands and portfolios, and detailing Defendant's business plan as an Azurity employee. This document details the pharmaceutical products that Defendant was a part of marketing, including details of action plans. Amongst other confidential information, this presentation includes "headwinds" and "tailwinds" information (business terms detailing favorable and unfavorable conditions Azurity deals with in the market) which would never be made publicly available.

i. On Friday June 19, 2026, Defendant sent to her personal email *HealthSystem Lists.xlsx*, which is an excel sheet with an extensive list of health system customers, their representative's contact information, what kind of GPO they are, and notes about their relationship with Azurity.

j. On Monday June 22, 2026, Defendant forwarded to her personal email an email chain from December 2025 containing *Email Thread re Xatmep.pdf*. Xatmep is one of Azurity's products that directly competes with Shorla's Jylamvo. The information found in this email thread can be used to pinpoint patient services information from group profiles, which would directly be used to compete with Azurity.

k. On Monday June 22, 2026, Defendant forwarded to her personal email an email chain from October 2022 which contained *PSHP_2022_Attendee_List_10..xlsx*, which is an excel sheet listing pharmacologists that attended a Pennsylvania Society of Hospital Pharmacists meeting, where they work, their titles, and their contact information.

77. These materials reflect nonpublic information concerning Azurity's strategic objectives, customer relationships, product positioning, and planned tactics for various pharmaceutical products.

**D. Azurity's Discovery of and Response to Defendant's Misconduct**

78. As a result of its investigation into Defendant's conduct, Azurity discovered that Defendant had forwarded confidential and proprietary records to her personal email address on multiple occasions prior to her departure.

79. On August 7, 2026, Azurity, through undersigned counsel, sent a Cease-and-Desist letter (the "Letter") to Defendant notifying her of her post-employment obligations and demanding that she comply with her confidentiality obligations. A true and correct copy of the Letter is attached hereto as **Exhibit C**.

80. The Letter informed Defendant that Azurity's investigation had revealed that she improperly forwarded confidential or proprietary and/or trade secret records to her personal email address on multiple dates in advance of her separation.

81. The Letter demanded, among other things, that Defendant: (a) acknowledge her awareness of the various restrictive covenants; (b) certify that she is not in violation of the Agreement's terms; (c) immediately return to Azurity all physical or electronic copies of confidential information and records in her possession, custody, or control; (d) make all personal email accounts, cloud storage accounts, and personal devices available for forensic examination; and (e) certify that she has not disclosed any of Azurity's confidential information to Shorla or any third party.

82. Defendant failed to respond to the Letter by the imposed deadline.

**E. Damage to Azurity**

83. Confidential and proprietary information and trade secrets like the foregoing give a level of insight into Azurity's operations that no competitor could otherwise obtain.

84. Azurity's strategic business plans for such pharmaceutical products disclose non-public revenue, market share, forecasts, targets, and a candid internal assessment of Azurity's

strengths, weaknesses, and planned positioning.

85. The confidential and proprietary information and trade secrets show a competitor precisely how Azurity is profitable, where it might be vulnerable, and how it measures success.

86. A rival with that plan in hand would know it could underprice Azurity without ever having to develop that intelligence independently.

87. The confidential and proprietary information and trade secrets derive independent economic value from not being generally known to, or readily ascertainable by, Azurity's competitors and would provide any such competitor with an unfair competitive advantage if obtained.

88. If Defendant is not stopped immediately, business will be diverted which may be irretrievable, causing Azurity irreparable damage.

89. Plaintiff Azurity asks this Court to act quickly to protect its Trade Secrets and to prevent Defendants from sharing the Trade Secrets.

90. Because the misappropriation only just came to light, Azurity continues to investigate the extent of the misconduct waged against it.

**F. Azurity's Entitlement to Injunctive Relief**

91. Azurity has clearly ascertainable rights in need of protecting including to: (a) preserve and maintain the integrity of its confidential and proprietary information and trade secrets together with the goodwill and market share it expended significant time and resources to create; and (b) prevent Defendant from violating the bargained-for provisions contained in the Agreement.

92. Defendant is prohibited from, among other things, retaining, disclosing, or using Azurity's confidential, proprietary information and trade secret information.

93. Defendant has engaged in and is continuing to engage in conduct that constitutes a violation of numerous provisions in Azurity's policies and is otherwise unlawful.

94. Azurity has suffered and will continue to suffer irreparable harm and economic damages as a result of Defendant's unlawful conduct. Moreover, Azurity has an urgent need to protect its legitimate business interests.

95. There is no adequate remedy at law that might address the irreparable injury caused by Defendant's actions. Absent relief, there is no way to accurately forecast the effect on Azurity's business over time or the extent of the long-term damages due to Defendant's actions.

96. Azurity is likely to prevail on the merits in this action. Should Azurity be required to wait until a full trial on the merits to enforce its legal rights, however, it will be irreparably harmed because it will continue to lose business, goodwill, and customers that it may never recover.

97. Injunctive relief is not contrary to the public health, safety, or welfare. Moreover, issuing injunctive relief will serve the public interest, and the harm to Azurity absent the requested relief strongly outweighs the risk of harm to Defendant should injunctive relief be granted. The public interest is, in fact, served by an injunction, as it protects Azurity's confidential information and goodwill and enforces those contractual promises that Defendant made to Azurity as a condition of employment and as consideration for Azurity's agreement to give Defendant access to its clients and confidential information in the first place.

## CAUSES OF ACTION

### COUNT I
### MISAPPROPRIATION OF TRADE SECRETS UNDER THE DEFEND TRADE SECRETS ACT, 18 U.S.C. § 1836, et seq.

98. Azurity realleges and incorporates by reference the foregoing paragraphs above as

if fully set forth herein.

99. While employed by Azurity, Defendant had access to Azurity's confidential and proprietary information and trade secrets, including its confidential product and market-strategy data, business operations and strategic plans, as described above.

100. Azurity expended substantial time, effort, money, and resources in developing and maintaining Azurity's confidential, proprietary, and trade secret information.

101. Azurity takes reasonable, affirmative measures to maintain the confidentiality of Azurity's confidential, proprietary, and trade secret information for Azurity's exclusive benefit and competitive advantage, including the measures described above.

102. Azurity provided access to its confidential, proprietary, and trade secret information in the course of employing Defendant.

103. Azurity's confidential, proprietary, and trade secret information that Defendant had access to is related to Azurity's products or services that are used or intended for use in interstate or foreign commerce.

104. Disclosure and unauthorized use of this type of information would undermine Azurity's competitive position in the highly competitive pharmaceutical industry.

105. Azurity's confidential, proprietary, and trade secret information derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, competitors such as Shorla.

106. Azurity's confidential, proprietary, and trade secret information constitute information subject to protection under the DTSA, 18 U.S.C. § 1839(3), and relate to services used in, or intended for use in, interstate commerce.

107. Defendant knew of the duty to maintain the secrecy of, and not disclose or

misappropriate, Azurity's confidential, proprietary, and trade secret information, and to return any such information in his possession upon separation.

108. Defendant misappropriated Azurity's confidential, proprietary, and trade secret information by acquiring, retaining, and, upon information and belief, transmitting them without authorization and for purposes not permitted by Azurity.

109. Defendant misappropriated Azurity's confidential, proprietary, and trade secret information, or appropriated them without authorization, by taking, retaining, and not returning them after his employment with Azurity ended.

110. Defendant plans further misappropriation of Azurity's confidential, proprietary, and trade secret information, by - on information and belief - seeking to disclose them to Shorla or use them in connection with his subsequent employment with Shorla, as evidence by his failure to provide assurances that he would not do so after receiving the cease-and-desist letter sent on Friday August 7, 2026.

111. Defendant's misappropriation was willful and malicious.

112. As a direct and proximate result of Defendant's misappropriation of Azurity's confidential, proprietary, and trade secret information, Azurity has suffered, and will continue to suffer, irreparable harm and economic damages, including disruption of business, lost revenues and profits, and unjust enrichment not otherwise accounted for in computing actual loss.

113. Unless Defendant is permanently restrained and enjoined from using or disclosing the Azurity's confidential, proprietary, and trade secret information, Azurity will suffer irreparable injury, as Defendant will continue to have the ability to use or disclose Azurity's confidential, proprietary, and trade secret information for his own benefit or that of Shorla.

114. Pursuant to the Defend Trade Secrets Act, 18 U.S.C. § 1836, Azurity is entitled to

injunctive relief, compensatory damages, exemplary damages, an award of reasonable attorneys' fees, and other appropriate relief.

**COUNT II**
**MISAPPROPRIATION OF TRADE SECRETS UNDER THE PENNSYLVANIA UNIFORM TRADE SECRETS ACT ("PUTSA"), 12 Pa. C.S.A. § 5301, et seq.**

115. Azurity realleges and incorporates by reference the foregoing paragraphs above as if fully set forth herein.

116. Azurity's confidential, proprietary, and trade secret information constitute trade secrets subject to protection under the PUTSA.

117. Azurity's confidential, proprietary, and trade secret information are not generally known to and are not readily ascertainable by proper means by others who can gain economic value from its use and/or disclosure.

118. Azurity exercises reasonable efforts to maintain the secrecy of its trade secrets and confidential information.

119. As an employee of Azurity, Defendant had access to Azurity's confidential, proprietary, and trade secret information.

120. Defendant knew of her duty to maintain the secrecy of, and not disclose or misappropriate, Azurity's confidential, proprietary, and trade secret information, and to return any such information in his possession upon separation.

121. Defendant misappropriated Azurity's confidential, proprietary, and trade secret information, or appropriated them without authorization, by - on information and belief - seeking to disclose them to Shorla in connection with subsequent employment with Shorla.

122. As set forth above, Defendant has misappropriated, accessed, transmitted, communicated, disclosed, and/or utilized Azurity's trade secrets and confidential information for

his own benefit and the benefit of Shorla, through improper means and without the consent of Azurity.

123. Defendant's misappropriation was willful and malicious.

124. As a direct and proximate result of Defendant's misappropriation of Azurity's Azurity's confidential, proprietary, and trade secret information, Azurity has suffered, and will continue to suffer, irreparable harm and economic damages, including disruption of business, lost revenues and profits, and unjust enrichment.

125. Unless Defendant is permanently restrained and enjoined from using or disclosing the Azurity's confidential, proprietary, and trade secret information, Azurity will suffer irreparable injury, as Defendant will continue to have the ability to use or disclose Azurity's confidential, proprietary, and trade secret information for his own benefit or that of Shorla.

126. Pursuant to Sections 5303 to 5305, Azurity is entitled to injunctive relief, double damages and affirmative relief to protect its confidential, proprietary, and trade secret information, an award of reasonable attorneys' fees, exemplary damages and other appropriate relief.

**COUNT III**
**VIOLATION OF THE COMMON LAW DUTIES OF CONFIDENTIALITY AND LOYALTY**

127. Azurity realleges and incorporates by reference the foregoing paragraphs as if set forth in full below.

128. As set forth above, Azurity employed Defendant as a senior member of its Strategic Accounts team, and trusted Defendant with trade secrets and other confidential information.

129. Defendant owed fiduciary duties of loyalty and confidentiality to Azurity not to actively use her position for her own personal benefit, or for the benefit of other companies such as Shorla, and/or to hinder Azurity's ability to succeed in its business operations.

130. Defendant was reposed with trust and confidence by Azurity, which she knew and voluntarily accepted.

131. During Defendant's employment, Azurity took steps to protect the information from unauthorized use or disclosure.

132. During her employment with Azurity, Defendant breached her duties of loyalty and confidentiality to Azurity by misappropriating confidential information and trade secrets of Azurity prior to leaving to work for Shorla.

133. Through this conduct, Defendant engaged in disloyal acts in anticipation of her future employment with Shorla, breaching her duties of loyalty and confidentiality.

134. Defendant knowingly breached the common law duties of confidentiality and loyalty owed to Azurity when causing/allowing the disclosure of the protected information because Defendant planned to use the information to benefit herself and her new employer Shorla.

135. As a direct and proximate result of Defendant's breaches of duties, Azurity has suffered damages.

**COUNT IV**
**BREACH OF CONTRACT**

136. Azurity realleges and incorporates by reference the foregoing paragraphs as if set forth in full below.

137. The contractual provisions referenced below and contained in the 2011 and 2019 Agreements are valid and enforceable contractual obligations between Defendant and Azurity.

138. Azurity performed its obligations under the Agreement. It provided Defendant valuable consideration for the restrictive covenants in that Azurity's predecessor offered initial

employment and continued to employ her. Moreover, Azurity provided Defendant with, and Defendant received access to, Azurity's confidential, proprietary, and trade secret information.

139. Defendant is in breach of her contractual obligations under these Agreements.

140. Upon information and belief, that Defendant intends to further breach those provisions in the future.

141. By breaching these valid and enforceable contractual provisions in the Agreement, Defendant has caused damages to Azurity in an amount that is currently unknown and incalculable, but which will be calculated in discovery and before trial.

142. Azurity has suffered and will continue to suffer damages and irreparable harm as a result of Defendant's actions.

**REQUEST FOR RELIEF**

Wherefore, Azurity respectfully requests that this Court enter judgment for Azurity and against Defendant as follows:

A. Temporarily, preliminarily, and permanently enjoining Defendant from continuing to violate the Azurity's confidentiality policies, including, but not limited to, enjoining her from using, disclosing, retaining, or further transmitting any of Azurity's confidential and proprietary information and trade secrets that Defendant transmitted via her personal email account, and award Azurity all damages to which it may recover under applicable law suffered as the direct and proximate result of Defendant's violation of her confidentiality obligations and Trade Secrets Acts;

B. Ordering Defendant to immediately return to Azurity any and all of its electronic and hardcopy confidential and proprietary information and trade secrets and to take all steps necessary to effectuate a forensic examination, pursuant to the following protocol:

- Defendant shall provide all computers, computer devices, peripherals, mobile devices, including phones, Internet-based or "cloud"-based storage sites or services, or other

information-storing equipment, software, or services (collectively "Storage Locations"), including any access information, in which she or anyone with whom she is associated (including, but not limited to, Shorla) have stored information belonging to Azurity at any time or to which she or anyone with whom she is associated have at any time connected any other Storage Location that contained Azurity's information (including private email accounts) to the third-party within five (5) calendar days after the entry of an Order from this Court.

- The third-party will perform forensic imaging of the devices and accounts and maintain a chain of custody.

- Using the forensic images, the third-party will perform an inspection of Defendant's devices and accounts. The inspections will not harm Defendant's devices and accounts and will be conducted in a manner to prevent the compromising of Defendant's personal and confidential data. Only the third-party will inspect or otherwise handle the devices and accounts.

- The third-party will inspect the devices and accounts for all electronically stored information of any kind (including, without limitation,, e-mails, texts, communications, WhatsApp messaging, documents, calendar entries, tasks, or attachments) with a creation, modification date or access date between January 1, 2026 and the present, which relate in any way, to: (a) Azurity; (b) Azurity's current, former, or prospective customers or clients; and (c) the allegations, claims, defenses or underlying facts in this action. Azurity will provide Defendant with a list of search terms for her review and input.

- The third-party also may analyze use, deletion, forwarding, accessing, copying or alteration activities performed on the devices as to any documents, email messages, or other files related to Defendant's work for Azurity.

- The third-party also may recover documents, email messages, or other files that have been deleted and may perform analysis regarding deletion, forwarding, access, copying, uploading, downloading, or other activities performed on the devices or accounts.

- The third-party will provide the results of the inspection for Defendant's review. Files obtained through the inspection will not be provided to Azurity until after Defendant has a reasonable opportunity to review the inspection results, not to exceed ten (10) calendar days after receiving the inspection results.

- If Defendant maintains that any electronically stored information found through the inspection should not be provided to Azurity, Defendant will assert such objections within five (5) days of receiving the results of the inspection from the third-party and will provide a privilege log consistent with Rule 26(b)(5)(A)(ii) of the Federal Rules of Civil Procedure identifying the basis for her objection to the production of the electronically stored information.

- Any of Azurity's confidential information and/or trade secrets, including email containing such information, will be deleted from the devices and accounts before the devices are returned to Defendant. The parties will confer to ensure such deletion does not include Defendant's personal information and data.

C. Enjoining Defendant from in any way divulging, disseminating, or utilizing Azurity's confidential and proprietary information and trade secrets in the interim and permanently (including - but not limited to - following a thorough forensic account requiring Defendant to permanently delete and/or destroy all copies of such confidential and proprietary information and trade secrets in her possession, custody, or control, in whatever form and on whatever device or account such information resides, and to certify such deletion and destruction in writing under oath);

D. Temporarily, preliminarily, and permanently enjoining Defendant from continuing to violate any of her confidentiality obligations;

E. Temporarily, preliminarily, and permanently enjoining Defendant from continuing to violate any of her confidentiality obligations and the Trade Secrets Acts including, but not limited to, enjoining her from continuing to solicit or attempt to solicit, call upon, contact, communicate with, or accept directly or by assisting others, any competitive business as described above from any current or prospective customers of Azurity whom she came to know, came to service, had material contact with or came to learn the identity of or about whom she had confidential and proprietary information and trade secrets while she was employed by Azurity; and

F. Entering judgment against Defendant, and awarding Azurity all damages available under applicable law together with prejudgment and post-judgment interest, costs, attorneys' fees, and such other and further relief, at law or in equity, as the Court deems just.

G. Awarding any other relief as the Court may deem appropriate or just, proper and equitable.

Date: August 17, 2026

Respectfully submitted,

**OGLETREE, DEAKINS, NASH,**
**SMOAK & STEWART, P.C.**

*s/Karen Baillie*
Karen Baillie, PA I.D. No. 66780
One PPG Place, Suite 1900
Pittsburgh, PA 15222
Telephone: 412-394-3333
karen.baillie@ogletreedeakins.com

Parker E. Thoeni, MD #0812180219 (Pro Hac Forthcoming)
One South Street, Suite 1800
Baltimore, MD 21202
Telephone: 410-843-3466
parker.thoeni@ogletree.com

Tyler W. Hartney, MN #0400100 (Pro Hac Forthcoming)
225 South Sixth Street, Suite 1800
Minneapolis, MN 55402
Telephone: 612-339-1818
tyler.hartney@ogletree.com

*Attorneys for Plaintiff*